## UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA VOTE BY MAIL, an Indiana non-profit corporation; VIRGINIA WOESTE, RENEE CASON, LEAH KENAGA, PATRICIA BROWN, and PATRICIA CARLIN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -v- | ) ) | Cause No. 1:19-cv-4245 |
| INDIANA ELECTION COMMISSION; PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY E. KLUTZ, in their official capacities as members of the Indiana Election Commission; and CONNIE LAWSON, in her official capacity as Indiana Secretary of State, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I. INTRODUCTION

1.     This action for declaratory and injunctive relief is brought against Indiana election officials who have approved, and continue to approve, the use of direct recording electronic voting machines (DREs) to record and tabulate votes in a majority of Indiana counties.

2.     DRE machines require a voter to cast his or her ballot on a touch-screen and provide no voter-verifiable paper trail to permit the voter to confirm that the ballot is counted as cast.

3.     While Indiana finds itself in a distinct minority of states in permitting the use of DRE machines, a majority of Indiana counties, including Tippecanoe County, Hamilton County, and Hendricks County, use the machines to conduct their elections.

4.     DRE machines are insecure and thus susceptible to hacking, may have undetected faults (bugs) in the software that could corrupt or lose votes, prevent the ability to conduct accurate and complete post-election audits and recounts, and thus undermine voter confidence in Indiana's electoral system.

5.     Defendants' approval and adoption of DRE systems violates the state and federal constitutional rights of voters to have their votes recorded and tabulated in an accurate, verifiable, and equal manner.

6.     The right to vote is one of the most fundamental and sacrosanct of all the rights conferred on citizens by the United States Constitution as well as by the Indiana Constitution. It is at the very foundation of our democracy. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v.*

*Sanders*, 376 U.S. 1, 17 (1964); *see also Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018) ("the right to vote 'is a fundamental matter in a free and democratic society'") (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964)).

7.    The right to vote includes the right of qualified electors within a state both to cast their ballots and to have them accurately counted in the final tallies. *United States v. Classic,* 313 U.S. 299, 315 (1941); *see also Davis v. Bandemer,* 478 U.S. 109, 124 (1986) ("everyone [has] the right to vote and to have his vote counted"); *Gray v. Sanders,* 372 U.S. 368 (1963) ("Every voter's vote is entitled to be counted once. It must be correctly counted and reported.").

8.    When a state accords arbitrary and disparate treatment to voters, those voters are deprived of their constitutional rights to due process and equal protection. *Bush v. Gore,* 531 U.S. 98, 107 (2000) (a state which accords arbitrary and disparate treatment to voters in its different counties violates the Equal Protection Clause, citing *Gray v. Sanders, supra*).

9.    The Indiana Constitution as well reflects its drafters' recognition of the vital role that the right to vote plays in the management of the State's affairs, and the importance of insuring that voters are treated equally regardless of where they reside, by explicitly providing that "[a]ll elections shall be free and equal." Ind. Const. Art. 2, § 1. The drafters' commitment to equality is reinforced by the equal privileges and immunities provision.  Ind. Constit. Art. 1, § 23.

10.     Guaranteeing the integrity of the vote count is instrumental to a healthy democracy. "Trusted election processes should be regarded as the gold standard of election administration . . . . [T]rusted election processes increase the likelihood that elections will be regarded as fair, even by the losing side and even in a partisan political environment." National Research Council, "Letter Report on Electronic Voting," *The National Academies Press* (2006), https://www.nap.edu/catalog/11704/letter-report-on-electronic-voting.

11.     In May 2018 the United States Senate Select Committee on Intelligence concluded that DREs are "at highest risk for security flaws" and therefore that states "should *rapidly* replace outdated and vulnerable voting systems" with systems that have a voter-verified paper audit trail (VVPAT). Senate Select Comm. on Intelligence, Russian Targeting of Election Infrastructure During the 2016 Election: Summary of Initial Findings and Recommendations (May 8, 2018) (emphasis added), available at https://www.intelligence.senate.gov/publications/russia-inquiry

12.     The Senate Intelligence Committee's recommendations came on the heels of near-unanimous consensus from election security experts that DRE machines are susceptible to cybersecurity threats and hacking. Moreover, the lack of a VVPAT renders voters unable to confirm that their individual vote has been accurately recorded and counted and renders election officials unable to confirm that

computer-reported results are accurate.

13.    Despite compelling evidence that DRE machines are insecure and susceptible to hacking, Indiana remains one of a handful of states that continue to permit county election officials to use DRE machines without a VVPAT.

14.    Currently, voters in 58 Indiana counties are required to use DRE systems without a VVPAT.

15.    The remaining 34 counties in Indiana use paper ballot systems that produce a VVPAT.

16.    Unless enjoined by this Court, it is not likely that Indiana will use machines with a VVPAT in all 92 of its counties by the 2020 general election.

17.    This leaves the democratic system dramatically weakened in Indiana. In a majority of its counties, voters will continue to cast their ballots on systems that have been shown to be unreliable and that most states have eschewed. These voters' electoral choices are less likely to be accurately counted than those of fellow residents whose counties have adopted paper-ballot systems. This, in turn, undermines all voters' confidence in a fair, accurate result.

18.    To ensure the rights of voters in DRE counties to cast an effective, auditable, and verifiable ballot in the 2020 general election, Plaintiffs seek to have Defendant Indiana Election Commission decertify all DRE machines prior to the 2020 general election and to adopt a statewide system of post-election risk limiting audits for all

elections.

## II. PARTIES

19.     Plaintiff INDIANA VOTE BY MAIL (Indiana VBM) is a non-profit

corporation organized under the laws of the State of Indiana. The purpose of

Indiana VBM, *inter alia*, is to protect the integrity of Indiana elections by ensuring

that all Hoosier voters are able to vote on machines with a VVPAT by the 2020

general election.

20.     Indiana VBM has organizational standing on its own behalf and

associational standing on behalf of its members to bring this action.

21.     Indiana VBM has organizational standing because it will be forced to

expend time and resources to counteract Defendants' certification and adoption of

unverifiable and insecure DRE machines.

22.     Indiana VBM has an interest in pursuing its organizational goals without

having to expend resources to counteract Defendants' unconstitutional actions and

inactions.

23.     Defendants' unconstitutional actions and failures to act have forced and will

force Indiana VBM to expend time and resources to meet with state and local

election officials to attempt to persuade them to cease their unconstitutional use of

DRE machines in Tippecanoe, Hamilton, and Hendricks counties, among others.

Time and resources that Indiana VBM officials have spent to ensure VVPAT for

all Hoosier ballots could have been spent, *inter alia*, on the group's efforts to encourage Indiana to adopt a more robust mail-in ballot system.

24.     Indiana VBM also has associational standing to bring this action on behalf of its members who are eligible voters and who live and vote in DRE counties.

25.     Plaintiff Victoria Woeste is a registered voter in Tippecanoe County, Indiana. Woeste voted in the 2018 general election and intends to vote in all upcoming municipal, state, and federal elections, including the 2020 general election. Woeste has voted in-person and has therefore been forced to cast a ballot on the DRE machines in use in Tippecanoe County. Woeste is aware of the security vulnerabilities of machines that lack a VVPAT and is concerned about casting her vote on DRE machines in the future.

26.     Plaintiff Renee Cason is a registered voter in Tippecanoe County, Indiana. Cason voted in the 2018 general election and intends to vote in all upcoming municipal, state, and federal elections, including the 2020 general election. In some previous elections, Cason has voted in-person and has therefore been forced to cast a ballot on the DRE machines in use in Tippecanoe County. In 2018, Cason's votes in several races were initially incorrectly recorded by the DRE machine that she used. Only after several attempts did the DRE machine appear to correctly record her votes; however, because the DRE machines in use in Tippecanoe County lack a VVPAT, Cason was unable to confirm that her votes were properly tabulated.

Cason is aware of the security vulnerabilities of machines that lack a VVPAT and is concerned about casting her vote on DRE machines in the future.

27.    Plaintiff Leah Kenaga is a registered voter in Tippecanoe County, Indiana. Kenaga voted in the 2018 general election and intends to vote in all upcoming state, and federal elections, including the 2020 general election. Kenaga has voted in-person and has therefore been forced to cast a ballot on the DRE machines in use in Tippecanoe County. In 2018, Kenaga's votes in several races were initially incorrectly recorded by the DRE machine that she used; however, because the DRE machines in use in Tippecanoe County lack a VVPAT, Kenaga was unable to confirm that her votes were properly tabulated. Kenaga is aware of the security vulnerabilities of machines that lack a VVPAT and is concerned about casting her vote on DRE machines in the future.

28.    Plaintiff Patricia Brown is a registered voter in Hamilton County, Indiana, and a member of Indiana VBM. Brown voted in the 2018 general election and intends to vote in all upcoming municipal, state, and federal elections, including the 2020 general election. In 2016, Brown voted in-person and was therefore forced to cast a ballot on the DRE machines in use in Hamilton County. Brown is aware of the security vulnerabilities of machines that lack a VVPAT and is concerned about casting her vote on DRE machines in the future. Accordingly, in 2018, Brown cast a mail-in, paper absentee ballot, and she intends to do so in

future elections.

29.     Plaintiff Patricia Carlin is a registered voter in Hendricks County, Indiana. Carlin voted in the 2018 general election and intends to vote in all upcoming municipal, state, and federal elections, including the 2020 general election. Carlin has voted in-person and has therefore been forced to cast a ballot on the DRE machines in use in Hendricks County. Carlin is aware of the security vulnerabilities of machines that lack a VVPAT and is concerned about casting her vote on DRE machines in the future.

30.     Defendants Paul Okeson, S. Anthony Long, Suzannah Wilson Overholt, and Zachary E. Klutz, are members of the INDIANA ELECTION COMMISSION (IEC), which is charged with administering Indiana election laws. Ind. Code § 3-6-4.1-14(a)(1). This includes the responsibility to adopt rules to "[g]overn the fair, legal, and orderly conduct of elections." *Id.* § 14(a)(2). Each is acting and will continue to act under color of state law and each is sued in his or her official capacity.

31.     Under Indiana law, the IEC "must approve any form of electronic voting system before it may be used at an election." Ind. Code § 3-11-7.5-1. Before approving any electronic – *i.e.*, DRE – system the IEC must ensure that it meets several statutory requirements, including that the "system must ensure secrecy to a voter in the act of voting." Ind. Code § 3-11-7.5-8. The system must also "must

correctly register and accurately count all votes cast for each candidate and for or against each public question," Ind. Code § 3-11-7.5-13, and "must be designed so that it can be determined whether the system has been operated after once being secured against additional voting." Ind. Code § 3-11-7.5-14.

32.     Defendant Connie Lawson is the Indiana Secretary of State and in that capacity is the chief election official of the State, with her primary office in this judicial district. Ind. Code § 3-6-3.7-1. She is charged with performing all ministerial duties related to the administration of elections by the state of Indiana. I.C. § 3-6-4.2-2(a). She is also responsible for enforcing and implementing Indiana's election laws and her office routinely issues guidance to county election officials in each of Indiana's 92 counties.  She is sued in her official capacity.

### III. JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights cases), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

34.     Venue is appropriate in the Southern District of Indiana because Defendants are based in Indianapolis and "reside" in the District. 28 U.S.C. § 1391(b)(1). Additionally, the IEC has approved the use of DRE machines in this District. 28 U.S.C. § 1391(b)(2).

## IV. GENERAL ALLEGATIONS

35.    Under Indiana law, the IEC must approve any form of electronic voting system before it may be used at an election. Ind. Code § 3-11-7.5-1. Indeed, a voting system may not be marketed, sold, leased, installed, or implemented in Indiana before an application for certification of the system is approved by the IEC.

36.    Approval of an electronic voting system expires on October 1 of the year following a presidential election, at which point the IEC may renew the approval. Ind. Code §§ 3-11-7.5-4, -28.

37.    Currently, five (5) vendors have been approved by the IEC: Dominion Voting; ES&S; Hart InterCivic, Inc.; MicroVote General Corporation; and Unisyn.

38.    The IEC has approved both direct-record electronic (DRE) and optical scan voting systems.

39.    A DRE voting machine records votes by means of a ballot display that can be activated by the voter. After the election it produces a tabulation of the voting data stored in a removable memory component.

40.    A risk-limiting audit is a post-election audit, which requires manually checking a portion of VVPAT with official results to confirm that ballots have been tabulated correctly.

41.    Most of the DREs that are currently in use and sold or leased to 58 Indiana

counties do not create a VVPAT or any other means by which to conduct a risk-limiting audit.

42.     The IEC has approved a form of optical scan voting equipment for the remaining 34 Indiana counties that do produce a VVPAT.

43.     Of the 58 Indiana counties in which the IEC has approved the use DRE voting machines, 48 counties use voting machines vended by MicroVote, an Indiana corporation that vends its voting equipment in several states.

44.     The IEC has also certified voting machines manufactured by Dominion Voting.[1] Specifically, the IEC has certified the Dominion Voting AccuVote TSX system.

45.     Dominion Voting AccuVote TSX system is a DRE voting machine that does not produce a VVPAT.

46.     Dominion AccuVote DRE voting machines are used in Tippecanoe County. The AccuVote machines are located at in-person polling places in Tippecanoe County. The machines are used by voters who vote absentee in-person pursuant to Ind. Code § 3-11-10-26 and by voters who cast their ballots on Election Day.

47.     In 2018, the Tippecanoe County AccuVote machines incorrectly recorded the votes of several voters. This malfunction was well-publicized. *See, e.g.*,

---

[1] Dominion Voting Systems acquired its election system business from Premier Election Solutions. Prior to 2007, Premier's name was Diebold Election Systems.

Lafayette Courtier & Journal, Election 2018: Faulty machine again blamed for switching votes at West Lafayette poll (Nov. 6, 2018).

https://www.jconline.com/story/news/politics/elections/2018/11/06/election-2018-faulty-machine-again-blamed-switching-votes-wl/1909035002/.

48.    In the 2018 General Election, approximately 53% of Indiana voters resided in counties using DRE machines, while approximately 46% of Indiana voters resided in counties with a VVPAT.

## V. SECURITY CONCERNS WITH DRE MACHINES

49.    DRE machines in use in Indiana are unverifiable, unauditable, and vulnerable to manipulation by outside actors.

50.    Experts in computer science have discussed and demonstrated how a malware virus can be introduced into a DRE machine by insertion of an infected memory card and thus alter the votes cast without detection.

51.    In March of 2018 the then-Secretary of the U.S. Department of Homeland Security, Kirstjen Nielsen, told the Senate Intelligence Committee that the continued use of DRE voting systems lacking an audit capability poses a "national security concern." U.S. Senate Select Committee on Intelligence (Mar. 21, 2018), https://www.intelligence.senate.gov/hearings/open-hearing-election-security.

52.    On September 6, 2018, after being commissioned to consider the future of voting in the United States, the National Academies of Sciences, Engineering, and

Medicine and associated National Research Council issued a consensus report entitled "Securing the Vote: Protecting American Democracy," emphasizing the need to secure and improve state and local election systems.

53.     That Report concluded that "[e]lectronic voting systems that do not produce a human-readable paper ballot of record raise security and verifiability concerns." Nat'l Academies of Sciences, Engineering, and Medicine, Securing the Vote: Protecting American Democracy 79-80.

54.     That Report recommended that elections "should be conducted with human-readable paper ballots," and that "voting machines that do not provide the capacity for independent auditing (e.g., machines that do not produce a voter-verifiable paper audit trail) should be removed from service as soon as possible . . . [and no later than] the 2020 presidential election." *Id.* at 80.

55.     That Report also underscored the importance of conducting post-election audits to ensure that computer-produced results accord with the results found by hand counting a sample of the VVPAT ballots.

56.     The Board of Advisors of the U.S. Elections Assistance Commission passed a resolution in 2018 recommending that the EAC "not certify any system that does not use voter-verifiable paper as the official record of voter intent," available at https://www.eac.gov/documents/2018/04/27/resolution-2018-03-auditability-of-voter-intent-passed-10-8-4-advisors-resolution-page/

57.     Last year the Center for American Progress gave Indiana an overall grade of "F" in election security, in large part because Indiana continues to allow DRE voting using machines that do not provide a paper record in more than half of its counties, many of which were purchased and put into service more than a decade ago, thereby leaving Indiana "susceptible to hacking and manipulation by sophisticated nation-states." Center for American Progress, Election Security in All 50 States (Feb. 2018), available at

https://cdn.americanprogress.org/content/uploads/2018/02/21105338/020118_ElectionSecurity-report11.pdf#page=78

58.     In 2019, the Indiana Legislature passed legislation, Senate Enrolled Act 570, signed by the Governor into law on April 24, 2019, which requires that every Indiana county stop using electronic voting systems that lack a VVPAT.

59.      This prohibition does not take effect until January 2030, Ind. Code § 3-11-15-13.3(c), thus permitting counties to use previously-certified DRE machines lacking a VVPAT for more than a decade. *See* Ind. Code § 3-11-14-2(b) and (c).

60.     In 2019, the Indiana Legislature also passed legislation, Senate Enrolled Act 405, signed by the Governor into law on April 18, 2019, which requires the Secretary of State to adopt a program for risk-limiting audits. The risk-limiting audit program, however, is a "pilot" program, which will only be in effect in certain counties and for certain elections at the discretion of Defendant Lawson.

Ind. Code §§ 3-12-13-4, and -5.

61.    Government-commissioned, research-based studies by cyber security computer scientists and elections experts have consistently emphasized that an independent record of an elector's physical ballot combined with post-election, risk limiting audits are essential to ensure the security of voters' ballots.

62.    The Final Report of the Special Counsel Into Russian Interference in the 2016 Presidential Election by Special Counsel Robert S. Mueller documents successful efforts of Russian agents' cyber intrusions targeting individuals and entities involved in the administration of U.S. elections, such as state boards of elections, secretaries of state, and county governments.

63.    In July 2019, the United States Senate Select Committee on Intelligence released its bipartisan Report on Russian Active Measures Campaigns and Interference in the 2016 U.S. Elections, finding that the Russian government had attempted to hack into the election infrastructure in all 50 states.

64.    To minimize the risk of interference going forward, the bipartisan Report emphasized that optical-scan machines with paper ballots are least vulnerable to hacking. "[A]t minimum, any machine purchased going forward should have a voter-verified paper trail . . . ." U.S. Senate Select Committee on Intelligence, Report on Russian Active Measures Campaigns and Interference in the 2016 U.S. Elections, 59.

65.     In June 2019, a group of distinguished former top government and tech industry officials issued a 108-page report, "Securing American Elections," (hereinafter the "Stanford Report") which includes 45 recommendations, the first two of which are that all vote counting systems provide a VVPAT and that election administrators conduct post-election risk-limiting audits for all elections. Stanford Cyber Policy Center, Securing American Elections (June 2019), available at https://cyber.fsi.stanford.edu/securing-our-cyber-future

66.     The Preface to the Stanford Report written by its editor, Michael McFaul, observes that in 2016 the Russian government, by its President Vladimir Putin and his proxies, attacked the United States by systematically interfering with our elections in an unprecedented scale, scope, and level of sophistication to influence the American presidential election.

67.     The Stanford Report also concludes, consistent with the Mueller Report, that the Russian Government initially aimed merely to delegitimatize the American electoral process and American democracy more generally by, *inter alia,* casting doubt about the integrity of the 2016 U.S. presidential election. This included Russian preparations, through Russian intelligence agents, to probe the U.S. electoral infrastructure to disrupt voter registration logs and even vote counts on Election Day.

68.     The Stanford Report also concludes that "the mere fact that Russian cyber

actors successfully penetrated and accessed the U.S. election infrastructure is highly concerning for its potential to undermine confidence" in future electoral outcomes.

69. The Russian threat to undermine public confidence in our electoral system continues to this day. As FBI Director Christopher Wray recently stated, "Make no mistake: The threat just keeps escalating and we're going to have to up our game to stay ahead of it . . . ."

70. In fact, Russian President Vladimir Putin as recently as October 2, 2019, when asked by a reporter, publicly stated during a forum in Moscow that he would "definitely intervene" in the 2020 U.S. elections.

71. Unlike the Mueller Report, the Stanford Report contained recommendations it described as "practical, concrete, and achievable before the 2020 presidential election," the very first of which is to increase the security of the U.S. election infrastructure by requiring that "all vote-counting systems provide a voter-verified paper audit trail."

72. In 2007, the Ohio Secretary of State commissioned a study on voting machines in use in Ohio. Pennsylvania State University et al., EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing (Dec. 7, 2007).

73. The EVEREST Report (at 103) concluded that the AccuVote system, which

is approved for use in Tippecanoe and other Indiana counties, "lacks the technical protections necessary to guarantee a trust-worthy election under operational conditions. Flaws in the system's design, development, and processes lead to a broad spectrum of issues that undermine the voting system's security and reliability. The resulting vulnerabilities are exploitable by an attacker, often easily so, under election conditions."

74.     Because the AccuVote system lacks a VVPAT, election officials must rely on the electronic record produced by the AccuVote software and stored in each machine's memory. As the EVEREST Report and other reports indicate, the AccuVote and other DRE machines are subject to manipulation, which could result in the loss, change, or dilution of a voter's ballot.

75.     There is a concrete and non-trivial risk that voters in those Indiana counties that continue to use DRE voting systems without a VVPAT will be less likely to cast an effective vote, and to have that vote counted, due to the fact that votes cast on DRE voting systems may be altered, lost, corrupted, diluted, or effectively not counted on the same terms as Indiana voters who cast their ballots using voting equipment with a VVPAT, which unlike DRE voting systems, enable a meaningful manual recount procedure and/or a risk limiting audit.

76.     By contrast, Indiana voters who vote on equipment with a VVPAT can be assured of a meaningful manual recount procedure whereby results can be

effectively audited.

77.     Indiana's decentralized voting system, which allows counties at least for the next decade to continue to use DRE voting machines lacking a VVPAT, poses a concrete risk of alteration of ballot tallies that would put their vote in jeopardy of not being counted.

78.     In light of the extensive publicity of Russian attempts to interfere with our election system and the Tippecanoe County AccuVote machine malfunctions in 2018, the lack of a VVPAT for DRE machines will undermine voter confidence in the integrity of our elections and the efficacy of their votes.

79.     The use of DRE machines in 58 Indiana counties is particularly harmful to voter confidence because of the well-publicized problems and malfunctions associated with DRE machines, as well as their susceptibility to hacking and tampering.

80.     Maintaining and promoting public confidence in the integrity of the electoral process is an important and legitimate state interest, because such confidence promotes and encourages citizen participation. *Crawford v. Marion Co. Elec. Bd.,* 553 U.S. 181, 191 (2008).

81.     Even in the absence of actual fraud or tampering, in an era of heightened cybersecurity threats, inaction by State officials to address threats to the integrity of our electoral system both encourages continued efforts by hostile foreign powers

to interfere with our elections, which in turn further decreases public confidence in our election system and thereby substantially and discriminatorily burdens the right to vote of all Hoosiers who live in one of the counties with DRE machines lacking a VVPAT.

82.     Indiana's continued use of DRE voting systems in the 58 Indiana counties lacking a VVPAT burdens Plaintiffs' fundamental right to vote and to have that vote accurately counted because they have reason to fear that the votes they cast on a DRE machine may be altered, diluted, given less weight or not counted on the same terms as the votes of Indiana voters who vote on machines with VVPATs.

83.     Indiana Code § 3-11-15-13.3(c) and Ind. Code § 3-11-14-2, both on their face and as applied, unequally burdens Plaintiffs' right to vote.

84.     There is no important state interest that is served in delaying the elimination of DRE machines until 2030 or allowing them to be used beyond the 2020 primary elections.

85.     Despite their awareness of the serious vulnerabilities of DRE voting machines, Defendants have no current plans to eliminate all DRE voting machines lacking a VVPAT prior to the 2020 general election.

86.     Defendants do not intend to decertify all DRE machines prior to the 2020 general elections or to require all counties to conduct risk-limiting audits with voting systems that produce a VVPAT by the 2020 general election.

## VI. FEDERAL CLAIMS

### A. Right to Vote

87.    Plaintiffs incorporate and reallege Paragraphs 1 through 86.

88.    The federal constitutional right to cast a ballot includes the protection against "debasement or dilution of the weight of a citizen's vote . . . ." *Reynolds v. Sims*, 377 U.S. at 555. Accordingly, the fundamental right to vote includes the right to participate in a trustworthy process that reliably records and counts a voter's ballot.

89.    The IEC's act of certifying and continuing to allow the continued use of DRE machines without a VVPAT has had and will continue to have the result of burdening the right to vote of voters such as the individual Plaintiffs who reside in DRE counties.

90.    The burdens imposed by Defendants are not necessary to promote any compelling governmental interest that cannot be accomplished by less restrictive means.

91.    At all relevant times, Defendants were acting and will continue to act under color of state law.

92.    Plaintiffs will suffer irreparable harm absent preliminary injunctive relief, any available remedies at law are inadequate, Plaintiffs have a reasonable likelihood of success on the merits, the balance of harms favors the Plaintiffs, and

the public interest would be served by the issuance of preliminary injunctive relief.

### B. Equal Protection

93.     Plaintiffs incorporate and reallege Paragraphs 1 through 92.

94.     The Equal Protection Clause of the Fourteenth Amendment guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. *Democratic Executive Committee of Florida v. Lee,* 915 F.3d 1312,1319 (11th Cir. 2019).

95.     By approving and continuing to authorize the use of DRE machines, unless enjoined, Defendants will continue to deny the individual Plaintiffs the right to participate in the electoral process equally with other qualified voters solely because of the county in which they reside.

### VII. STATE LAW CLAIMS

96.     Plaintiffs incorporate and reallege Paragraphs 1 through 95.

97.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims by virtue of 28 U.S.C. § 1376.

98.     By requiring some but not all voters to vote on DRE machines without a VVPAT, Defendants are disparately and unequally burdening Plaintiffs' fundamental right to vote and thus violating and abridging Plaintiffs' constitutional rights to equal privileges under Art. 1, § 23, and to "free and equal" elections under Art. 2, § 1 of the Indiana Constitution.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

(1) enter an order declaring Ind. Code § 3-11-15-13.3(c) and Ind. Code § 3-11-14-2 unconstitutional insofar as they permit the continued use voting machines without a VVPAT until 2030;

(2) enter an order declaring it unconstitutional for Defendant to fail to decertify DRE machines lacking a VVPAT prior to the 2020 general election;

(3) preliminarily and permanently enjoin Defendant to decertify DRE machines without a VVPAT prior to the 2020 federal general elections;

(4) preliminarily and permanently enjoin Defendant from renewing the certification of any DRE machine without a VVPAT;

(5) preliminarily and permanently enjoin Defendant to require all counties to conduct risk-limiting audits using the VVPAT produced by voting machines;

(6) award Plaintiffs their costs and reasonable attorneys' fees; and

(7) grant such other relief as may be warranted.

Respectfully submitted,


*/s/William R. Groth*
William R. Groth
MACEY SWANSON LLP
445 N. Pennsylvania Street, Ste. 401
Indianapolis, IN 46204
Phone: (317) 637-2345
E-mail: WGroth@fdgtlaborlaw.com


James Harper
HARPER & HARPER ATTORNEYS
304 West, US-6
Valparaiso, IN  46385
Phone: (219) 762-9538
E-mail: jim@harperattorneys.com
*Admission pending*